UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

ANTHONY MULLINS,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )   CASE NO. 4:06-cv-0159-DFH-WGH
                                          )
MICHAEL J. ASTRUE, Commissioner           )
of the Social Security Administration,    )
                                          )
            Defendant.                    )

ENTRY ON JUDICIAL REVIEW

Plaintiff Anthony Mullins seeks judicial review of the Commissioner of Social Security's final decision denying his May 19, 2003 claim for disability insurance benefits under the Social Security Act.[1]  Because Mr. Mullins did not appeal an earlier determination that he was not disabled under the Act, the Administrative Law Judge (ALJ) acting for the Commissioner did not consider whether Mr. Mullins was disabled prior to May 20, 2002.  The ALJ determined that Mr. Mullins was last insured on June 30, 2002, and did not consider evidence of disability after that date.  Within this narrow window of May 20, 2002 to June 30, 2002, the ALJ determined, Mr. Mullins suffered from lumbar spondylosis / degenerative disc disease and cervical degenerative disc disease but was not disabled within the

---

[1]Mr. Mullins also applied for supplemental security income under the Social Security Act in his May 19, 2003 application, and this claim was also denied by the ALJ.  Mr. Mullins did not appeal from the ALJ's decision regarding his eligibility for supplemental security income.

meaning of the Act because he retained the residual functional capacity to perform light exertional work with certain restrictions. For the reasons discussed below, the court affirms the Commissioner's denial of disability insurance benefits.

*Background*

Mr. Mullins was born in 1961 and was 45 years old when the ALJ denied his claim for benefits under the Social Security Act. Mr. Mullins has a ninth grade education and is able to read, write, and perform simple arithmetic. R. 557. He previously worked as an auto body worker, repairman, and grinder. R. 558-62. Mr. Mullins claimed that he has been unable to work since May 2, 2001.

Mr. Mullins previously applied for disability benefits in March 2002. R. 42. This application was denied at the initial stage of review on May 20, 2002. R. 45-48. Mr. Mullins did not appeal that denial to an ALJ. In his opinion regarding Mr. Mullins' May 19, 2003 claim for benefits – the one under review now – the ALJ expressly stated that he was not reopening Mr. Mullins' previous disability determination. R. 18. Mr. Mullins did not argue that this decision should have been reopened under 20 C.F.R. § 404.988 or 404.989, so he is required to show that he was disabled after May 20, 2002. See *Campbell v. Shalala*, 988 F.2d 741, 745 (7th Cir. 1993) (refusing to reconsider ALJ's decision that two previous applications for benefits barred finding of disability prior to date on which claimant's second application was rejected); *Rucker v. Shalala*, 894 F. Supp. 1209,

1217-18 (S.D. Ind. 1995) (discussing preclusive effect of earlier disability determination).

In addition, Mr. Mullins does not dispute the ALJ's finding that his insured status expired on June 30, 2002.  R. 20.  He therefore must establish that he was disabled on or before that date to recover disability insurance benefits.  See 42 U.S.C. §§ 423(a)(1)(A) & (c)(1); 20 C.F.R. § 404.131; *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (ALJ properly considered whether claimant's impairments rendered him disabled prior to expiration of insured status); *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

The record contains information about Mr. Mullins' medical history from 1986 until late 2005.  Because of his previous disability applications and expired insured status, much of this evidence falls outside of the relevant disability onset period.  Nevertheless, the court summarizes the full record here since it is helpful for understanding the background and progression of Mr. Mullins' health problems.  *E.g.*, *Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988) (noting that ALJ discussed prior proceedings "only to describe the claimant's background and not to review their merits").

I.      *Medical Evidence*

    A.      *Mr. Mullins' Back and Neck Impairments*

Mr. Mullins injured his back while at work on January 23, 1996.  R. 205. He underwent back surgery (a lumbar laminectomy with discectomy) in an attempt to resolve this problem, but he continued to complain of chronic low back pain after surgery.  R. 195-98, 200-01.  On May 31, 1998, Dr. Robert Swartzel noted findings that could represent an old or chronic root or cord lesion on Mr. Mullins' right side at his fifth lumbar or first sacral vertebrae.  R. 296.  Dr. Swartzel did not see any evidence of a problem on Mr. Mullins' left side.  R. 296.

On July 7, 1998, Dr. Michael Swank recorded that Mr. Mullins' gait was normal, that his ability to heel-and-toe walk and to rise onto a single step were unremarkable, and that Mr. Mullins' range of motion in his lower extremities was also unremarkable.  R. 206-208.  Dr. Swank noted that Mr. Mullins' range of motion in his lumbar spine was 40 degrees instead of a normal 60 degrees.  R. 207.

These findings were echoed by Dr. Thomas Carothers in September 1998. Dr. Carothers ultimately diagnosed Mr. Mullins with a herniated L4-5 nucleus pulposus and symptomatic L5 spondylosis.  R. 201.  MRI and CT scans of Mr. Mullins' lumbar spine revealed degenerative disc disease at the L5-S1 level.  In the

face of these findings, however, Dr. Carothers found that Mr. Mullins was in no acute distress and had normal standing posture.  R. 201.

By September 1998, Mr. Mullins' doctors were considering additional surgery to alleviate his back pain.  The worker's compensation bureau declined to pay for additional surgery, so Mr. Mullins received no further surgical treatments on his back.  R. 205, 209, 293.  In June and July 2001, Mr. Mullins underwent epidural steroid injections for his back pain.  R. 297-301.

In the meantime, an August 24, 2000 MRI revealed that Mr. Mullins suffered from a herniation close to the fourth and fifth cervical vertebrae with a narrowing of the left nerve root.  R. 235.  On September 15, 2000, Dr. Carlos Ongkiko performed a microdisectomy of Mr. Mullins' neck and fused Mr. Mullins' fourth and fifth cervical vertebrae.  R. 255.  Although at first Mr. Mullins appeared to doing "remarkably well," he continued to complain of pain in his neck and around his upper back muscles.  R. 246-47.  An x-ray revealed an extruded bone fragment and pseudoarthrosis at his fourth and fifth cervical vertebrae, and on March 30, 2001 Mr. Mullins underwent additional surgery to remove the extruded bone graft and surgical plating.  R. 279-80.  When he was assessed before surgery, it was noted that Mr. Mullins walked with a limp but was independent in self care, had no history of falls, did not have a limited range of motion, and had steady balance and gait.  R. 286.

By April 16, 2001, Dr. Ongkiko noted that Mr. Mullins was not in compliance with post-surgery instructions:  he had returned to work the day after surgery, and he was wearing a soft collar instead of a hard collar.  R. 248.  By December 5, 2001, x-rays of Mr. Mullins' spine showed near complete obliteration of the intervertebral disc space but no acute bony abnormality.  R. 190.

In the meantime, Mr. Mullins began treating with Dr. Art Donnersbach, a pain specialist.  In May 2001, Mr. Mullins reported to that he suffered from central lower back pain with burning in his buttocks and some sharp pain radiating down the backs of his legs.  R. 293-94.  However, Mr. Mullins informed Dr. Donnersbach that his neck pain was "minimal."  R. 293.  Dr. Donnersbach noted that Mr. Mullins appeared to be in mild to moderate discomfort, but his heel-to-toe walking was preserved.  R. 294.  In addition, Dr. Donnersbach found that Mr. Mullins' Romberg test was normal, his spine was straight, his extension was normal, and his straight leg signs were negative, although Mr. Mullins reported pain in his back when he raised his legs.  R. 294.

B.    *Mr. Mullins' Knee Impairments*

Mr. Mullins underwent a knee arthroscopy in April 1999.  R. 211-13.  Years later, in 2003, Mr. Mullins consulted Dr. Thomas Shockley, Jr. about knee pain.  He informed Dr. Shockley that he had suffered from knee pain for about ten years.  R. 323.  On March 3, 2003, Dr. Shockley noted arthritis and narrowing of

the joint space in Mr. Mullins' left knee.  R. 324.  Then, on September 15, 2003, Dr. Shockley found arthritis in Mr. Mullins' right knee.  R. 327.  Dr. Shockley noted that although Mr. Mullins complained of constant, "24 hour" pain, he had few mechanical symptoms and was able to extend his knee and flex it easily.  R. 327.  Dr. Shockley injected Mr. Mullins' right knee with Kenalog and Lidocaine.  R. 327.  After that treatment, Mr. Mullins could extend his knee almost fully but still complained of pain.  R. 328.

C.    *Mr. Mullins' Heart Condition*

In August 2000, Mr. Mullins sought treatment for chest pain.  Dr. Kurt Stedje found that Mr. Mullins' lungs were clear and the sizes of his heart and pulmonary vessels were within normal limits.  R. 217.  A stress test showed that Mr. Mullins was not suffering from a decrease in blood supply caused by constriction or obstruction of his blood vessels and that he had normal blood pressure, normal heart rate, and excellent capacity for exercise.  R. 219.  In spite of these findings, Mr. Mullins had a heart attack while undergoing surgery on his neck on September 15, 2000.  R. 258.  According to Dr. Thomas Broderick of the Ohio Heart Health Center, Mr. Mullins was not found to have significant obstructive disease, and further intervention was not necessary at that time.  R. 268.  At a follow-up appointment in October 2000, Dr. Broderick stated that Mr. Mullins "seems to have done relatively well.  He has had some intermittent symptoms of chest discomfort, but almost all of those sound atypical in

description." R. 269. The exception was Mr. Mullins' complaint of chest and arm discomfort, which Dr. Broderick suspected was related to Mr. Mullins' neck problem, not his heart. R. 269. By March 2001, Mr. Mullins reported that he had experienced no recent chest pain or respiratory distress. R. 188. A stress test demonstrated that he had a normal blood pressure response to exercise and had no evidence of decreased blood supply caused by obstruction of his blood vessels. R. 188. Just over a year later, in April 2002, Mr. Mullins went to the emergency room complaining of chest pain, but after he arrived, he left against medical advice. R. 192-93.

D.    *Mr. Mullins' Mental Condition*

The notes of Mr. Mullins' family physician, Dr. Jack Litle, reflect that Mr. Mullins complained regularly that he was suffering from depression. R. 154-75. Over the course of his treatment of Mr. Mullins, which began in 1995 and lasted at least until 2001, Dr. Litle prescribed various anti-depressant and anti-anxiety medications, including Zoloft (R. 155-56), Prozac, (R. 157-59, 161-64), Elavil (R. 156-59, 161, 166-67), Pamelor (R. 161), Celexa (R. 164), and Effexor (R. 164-165, 167, 171, 174). Dr. Litle's treatment notes indicate that Dr. Litle did not prescribe anti-depressants to Mr. Mullins later than October 2001. R. 174-75. In September 1997, Mr. Mullins refused Dr. Litle's offer to arrange an appointment with a psychiatrist. R. 163. By May 2001, Mr. Mullins described his depression as "mild." R. 293.

II.   *Doctors' Opinions on Residual Functional Capacity*

Dr. J.V. Corcoran, a state agency medical consultant, assessed Mr. Mullins'
condition and capabilities and completed a Physical Residual Functional Capacity
Assessment on May 9, 2002.  R. 315-21.  He found that Mr. Mullins was able to
lift twenty pounds occasionally and ten pounds frequently, and was able to stand
or walk for about six hours in an eight hour workday.  R. 315.  He found that Mr.
Mullins could occasionally climb, balance, stoop, kneel, crouch, and crawl.  R.
316.  He found that Mr. Mullins did not suffer from any manipulative, visual, or
communicative limitations.  R. 317-18.  Dr. Corcoran believed that Mr. Mullins
should avoid uneven or wet surfaces, should avoid moderate exposure to extreme
heat and humidity, and should avoid concentrated exposure to extreme cold,
wetness, or vibration, but was not limited in his ability to withstand noise or
fumes, odors, dusts, gases, and poor ventilation.  R. 318.

In October, 2002, Mr. Mullins began seeing Dr. Timothy Smith, a family
medicine practitioner.  R. 341, 349, 362.  After Mr. Mullins' May 27, 2004 visit,
Dr. Smith completed a "Psychiatric-Psychological Impairment Questionnaire," in
which he stated that Mr. Mullins suffered from "anxiety disorder."  R. 341.  Dr.
Smith did not complete a DSM-IV evaluation of Mr. Mullins but indicated that Mr.
Mullins had, among other symptoms, recurrent panic attacks, loss of interests,
feelings of guilt or worthlessness, difficulty thinking or concentrating, decreased
energy, and generalized persistent anxiety.  R. 342.  Dr. Smith did not indicate

what Mr. Mullins' primary symptoms were or which of his symptoms was most severe. He marked that Mr. Mullins' "symptoms and functional limitations [were] reasonably consistent with [Mr. Mullins'] physical and/or emotional impairments" as described in Dr. Smith's evaluation. R. 343.

Dr. Smith noted that Mr. Mullins was "markedly limited" in his ability to perform activities within a schedule, to maintain regular attendance, to be punctual, and to work with or near others without being distracted. R. 344. Dr. Smith also noted that Mr. Mullins was "markedly limited" in his ability to compete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 345.

On May 27, 2004, Dr. Smith completed a "Multiple Impairments Questionnaire" in which he opined that, in an eight-hour work day, Mr. Mullins would be able to sit for only one hour and stand or walk for no more than one hour. R. 351. He indicated that it would be necessary for Mr. Mullins to not sit or stand continuously in a work setting, and that Mr. Mullins had to stand up and move around every twenty to thirty minutes for at least ten to fifteen minutes. R. 351-52. Dr. Smith marked that Mr. Mullins should never lift or carry weight above fifty pounds, should only occasionally lift or carry weight between ten and fifty pounds, and could frequently lift or carry weight of ten pounds or less. R. 352. Dr. Smith found that Mr. Mullins would be unable to keep his neck in a

constant position (as though looking at a computer screen or down at a desk) and that he suffered from constant pain.  R. 353-54.

Generally, Dr. Smith marked that Mr. Mullins would likely be absent from work because of his impairments more than three times a month and that he would need to take unscheduled breaks to rest at unpredictable intervals at least every twenty to thirty minutes for intervals lasting fifteen to twenty minutes.  R. 354-55.  Dr. Smith believed that Mr. Mullins was unable to push anything, pull anything, kneel, bend, or stoop.  R. 355.

In March 2005, Dr. Smith completed a second "Multiple Impairments Questionnaire" concerning Mr. Mullins' physical condition. R.362-69. Dr. Smith's findings in March 2005 were the same as his findings in May 2004 in all major respects.

Dr. Smith stated that, in his best medical opinion, the earliest date that the limitations he noted in Mr. Mullins' multiple impairments questionnaires applied to Mr. Mullins' condition was October 10, 2002 (the date that Dr. Smith first examined Mr. Mullins,) several months after his insured status expired.  R. 341, 349, 355, 368.

III.    *Testimony at the Hearing*

Mr. Mullins testified before the ALJ on December 14, 2005.  Mr. Mullins testified that in June 2002, he was still suffering from constant low back pain in spite of back surgery in 1996.  R. 563-64.  The pain traveled from his back into both of his legs to his toes.  R. 564.  He also testified that after undergoing neck surgery in March 2001, he suffered through six months of misery that had eased but not resolved by June 2002. R. 554-65.  He asserted that in June 2002 he had constant problems in both knees.  R. 566.  He believed that the condition of both his back and his neck had worsened since June 2002.  R. 567.

Mr. Mullins claimed that he had problems with "everything," including lifting, bending, sleeping, sitting, and walking, in June 2002.  R. 566-67.  He avoided taking stairs.  R. 568.  Mr. Mullins was unsure how long he could stand at one time, stating:  "I'm always switching from leg to leg when I stand, moving around.  I don't sit, you know – I don't stand in one position all the time . . . ."  R. 567.  At one point, Mr. Mullins testified that he was unable to sit for longer than about an hour.  R. 572.  Later in the hearing, Mr. Mullins estimated that he would be able to sit for only about fifteen to twenty minutes or to stand for about five minutes before needing to change positions.  R. 576.  He claimed that he would spend his day prone on the couch, watching television.  R. 569, 572.  He was able to drive and to take care of his personal grooming needs, although he stated that he did not take as many showers as he used to.  R. 569.  He testified that he did not do any cooking, housework, or yardwork.  R. 570.  He estimated that in June 2002, he would need to be absent from his job at least a week out of every month.

R. 575.  He claimed that at the time of the hearing, he was unable to walk five blocks but was able to walk for about five to ten minutes.  R. 568.

Mr. Mullins also claimed that he suffered from depression and anxiety in June 2002 and that those feelings were "somewhat" similar to how he felt at the time of the hearing.  R. 578-79.  He claimed that his panic attacks had gotten worse since June 2002.  R. 579.  He testified that he had seen a mental health professional some years before, but he did not consult another mental health professional until 2005.  R. 581.

Micha Daoud, a vocational expert, also testified at the hearing.  The ALJ asked Ms. Daoud whether, as of June 2002, there were jobs in the local economy available to a hypothetical person of Mr. Mullins' age, education, and work experience who could lift, carry, push and pull up to ten pounds occasionally and five pounds frequently, and who occasionally could stoop, kneel, crouch, and climb ramps or stairs but who could not crawl or climb ladders, ropes, or scaffolding and could not perform work requiring the forceful use of the lower extremities.  R. 585-86.  The hypothetical individual could stand or walk up to two hours in an eight hour work day in thirty minute intervals, but would then need to be able to sit for two or three minutes, and could sit for eight hours, up to one hour at a time with a two or three minute break.  R. 586.  The individual could not walk on grossly uneven terrain or work at unprotected heights or around hazardous machinery.  R. 586.

Ms. Daoud testified that the hypothetical individual would not be able to perform Mr. Mullins' past relevant work and that none of Mr. Mullins' acquired skills would transfer to any other skilled or semiskilled work within the proposed limitations.  R. 586.  Ms. Daoud testified that the hypothetical individual would nevertheless be able to perform sedentary nonskilled work, including work as a food and beverage clerk, an information clerk, an interviewer, an investigator, or in administrative support.  R. 586-87.  In June 2002, there were approximately 280,960 jobs available in the national economy and 1,200 jobs available in the local economy for sedentary nonskilled work with the listed restrictions.  R. 587-88.  Ms. Daoud testified, however, that if the hypothetical individual also needed to recline for two hours during the work day, that additional limitation would eliminate all jobs.  R. 587.  In addition, if the hypothetical individual had the limitations listed by Dr. Smith in his report concerning Mr. Mullins' condition, that would also eliminate all jobs.  R. 588.

### Disability and the Standard of Review

To be eligible for the disability insurance benefits he seeks, Mr. Mullins must establish that he suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not

less than 12 months.   42 U.S.C. § 423(d)(1)(A).   Mr. Mullins was disabled only if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to him in his immediate area, or whether he would be hired if he applied for work. 42 U.S.C. §§ 423(d)(2)(A).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Mr. Mullins was disabled under the Social Security Act on or before June 30, 2002, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520.  The steps are as follows:

(1)   Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

-15-

(4)     If not, could the claimant do his past relevant work?  If so, he was not disabled.

(5)     If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. §§ 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

The ALJ found that Mr. Mullins satisfied step one.  He had not engaged in any substantial gainful activity at any time relevant to the ALJ's decision.  R. 20.  At step two, the ALJ found that Mr. Mullins had the following severe impairments: lumbar spondylosis/degenerative disc disease, status post L4-5 laminectomy and discectomy in 1996 and cervical degenerative disc disease, status post microdiscectomy and fusion in September 2000 and removal of bone graft and plating in March 2001.  R. 20-22.  These impairments did not meet or equal any of the listings that would have automatically qualified Mr. Mullins for benefits at step three.  R. 22-23.  At step four, the ALJ determined that Mr. Mullins was no longer able to perform his past relevant work.  R. 24-25.

At step five, the ALJ determined that Mr. Mullins retained the residual functional capacity to perform sedentary unskilled work with a number of limitations.  R. 25-26.  Based on the testimony of the vocational expert, the ALJ found that a person with Mr. Mullins' residual functional capacity would have

-16-

been able to work as a food and beverage clerk, an information clerk, an interviewer, an investigator, or in administrative support, and that there were 1,200 such jobs in Mr. Mullins' local economy and 280,960 such jobs available in the national economy.  R. 25.  The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. § 405(g).  Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the

Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level his analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning.  *Diaz*, 55 F.3d at 307-08.

*Discussion*

Mr. Mullins raises three arguments in this case.  First, he contends that the ALJ wrongfully discounted the opinion of Dr. Smith, who began treating him approximately four months after he was last insured.  Second, Mr. Mullins argues that the number of jobs in the local economy that the vocational expert found would be available to an individual with his skills, education, and limitations did not constitute a substantial number of jobs.  Third, Mr. Mullins argues that the ALJ failed to consider properly the combined effects of his severe and non-severe impairments.

I.    *Dr. Smith's May 2004 Opinion*

Mr. Mullins argues that the ALJ should have given more weight to the opinion of Dr. Smith, asserting that Dr. Smith completed the Psychiatric-

Psychological Impairment Questionnaire and the Multiple Impairments Questionnaire in October 2002, "barely" four months after the date on which Mr. Mullins was last insured for purposes of disability insurance benefits.  Pl. Br. at 6.  Mr. Mullins also argues that because Dr. Smith was his treating physician, Dr. Smith's report should have been given greater weight.  Pl. Br. at 8.

The court notes that Dr. Smith did not complete these forms in October 2002 – he completed the forms no earlier than May 2004.  R. 341, 356, 369.[2]  He began treating Mr. Mullins in October 2002.  R. 341, 349, 362.  Dr. Smith stated that, in his best medical opinion, the earliest date that the limitations he noted in the questionnaire applied was October 10, 2002.  R. 355, 368.  It was not inappropriate, then, for the ALJ to give little weight to Dr. Smith's opinion for purposes of determining whether Mr. Mullins was disabled as of June 30, 2002 and earlier.

An ALJ is required to consider all legally relevant evidence, and it is the ALJ's responsibility to determine how much credence to afford particular pieces of evidence.  See *Diaz,* 55 F.3d at 309.  Here, the ALJ decided to give little weight to Dr. Smith's opinion because Dr. Smith did not begin treating Mr. Mullins until several months after his eligibility for disability insurance benefits had expired.

---

[2]There is no question that Dr. Smith completed the first Multiple Impairments Questionnaire on May 24, 2004 and the second on March 3, 2005 because he dated his signatures.  R. 349, 369.  He did not date his signature on the Psychiatric-Psychological Impairment Questionnaire, but he noted that the most recent date on which he had treated Mr. Mullins was May 24, 2004.  R. 341.

R. 24.  It is difficult to discern how Dr. Smith's opinion concerning Mr. Mullins' condition in May 2004, March 2005 (or even October 2002) can shed any light on Mr. Mullins' condition in June 2002 without resorting to speculation.  Whether or not Dr. Smith was Mr. Mullins' treating physician does not change this analysis.  Again, Dr. Smith began treating Mr. Mullins after Mr. Mullins' insured status had expired.  Dr. Smith's opinion could have only slight probative value in the ALJ's analysis of Mr. Mullins' eligibility for disability insurance as of June 2002.  The ALJ did not err in giving very little weight to Dr. Smith's opinion in making his determination.

II.     *Substantial Number of Jobs*

At the hearing, the vocational expert testified regarding the number of jobs that would have been available in the national and local economy as of June 2002 to an individual of Mr. Mullins' age, education, work experience, and residual functional capacity.  R. 585-87.  Ms. Daoud testified that, as of June 2002, there were 1,200 such jobs in Mr. Mullins' local economy and 280,960 such positions in the national economy.  R. 586-87.  Mr. Mullins does not argue that Ms. Daoud's testimony or the ALJ's reliance on Ms. Daoud's testimony was somehow incorrect.  He argues that 1,200 local jobs is not a "substantial" number for purposes of determining whether he was capable of working in June 2002.  Pl. Br. at 8-10.

Under the disability standard, however, the question is not whether 1,200 jobs in Mr. Mullins' local economy was a substantial number of jobs, but whether 280,960 jobs in the national economy was a substantial number of jobs.  See 42 U.S.C. §423(d)(2)(A) (an individual is disabled only if he or she is unable to "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives").  The Social Security Act defines work existing in the national economy as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id.*; see also 20 C.F.R. §404.1566(b) ("if work that you can do does exist in the national economy, we will determine that you are not disabled").  Where it is possible for an individual to do work existing in the national economy, it is not sufficient to show that the individual is unemployed because of his or her inability to find work, the lack of work or job openings in that person's local area, or because the individual does not wish to do a particular type of work.  See 20 C.F. R. §404.1566(c).  To prevail in this argument, then, Mr. Mullins must show that the jobs available to a person of his limitations and experience existed only in very limited numbers in relatively few locations outside of his local region.  See 20 C.F.R. § 404.1566(b).

Mr. Mullins has not made such a showing.  He argues that because the region analyzed by the vocational expert is a "large, populated area," 1,200 is not a substantial number and that in Southern Indiana "an even lesser number of

-21-

jobs can be anticipated." Pl. Br. 9.[3]  There is no bright line to determine how many jobs might constitute a significant number of jobs in any particular area of the country.  However, Mr. Mullins must do more than "anticipate" the availability of work; he must make some showing that jobs appropriate for his age, education, experience, and limitations did not exist in his region.   See 20 C.F.R. § 404.1566(b).  He also must do more than argue that the jobs proposed by the vocational expert were jobs that he "[had] never performed before, and [had] no experience doing." Pl. Br. at 10.  These arguments in particular cut directly against the requirements of the Social Security Act and the applicable regulations. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b).  Mr. Mullins has not brought forth sufficient grounds on which to revisit the ALJ's decision. The ALJ did not err in finding that 280,960 jobs in the national economy (and 1,200 jobs in the local economy) was a substantial number of jobs under the Act.

III.   *The Combined Effects of Multiple Impairments*

Mr. Mullins argues that the ALJ inappropriately disregarded the cumulative effect of his many impairments.  He asserts that in deciding whether he was disabled as of June 30, 2002, the ALJ should have taken into account his knee impairments, his heart condition, and his mental health problems, along with his

---

[3]Mr. Mullins stated that the vocational expert analyzed data from "Greater Cincinnati and the surrounding communities." Pl. Br. 9. The record reflects that the vocational expert analyzed the Madison, Indiana area, including seven counties in Indiana and three in Kentucky.  R. 582.

back and neck impairments.  Pl. Br. at 10.[4]  Mr. Mullins correctly asserts that the ALJ was required to consider his condition as a whole person, not on an impairment-by-impairment basis.  See 20 C.F.R. §404.1523 (decision maker should "consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"); see also *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003) (ALJ was required to consider the "entire constellation" of ailments affecting a claimant upon determining that one or more of the impairments was severe).  However, giving little weight to evidence of extremely limited probative value is very different from failing to consider relevant evidence.  Because Mr. Mullins was foreclosed from arguing that he was disabled prior to May 20, 2003, and was last insured on June 30, 2002, the ALJ did not err by giving little weight to evidence outside the relevant time period.

    In making his decision, the ALJ recounted that Mr. Mullins presented evidence of knee problems dating from the late 1990s and additional evidence

---

[4]Mr. Mullins also lists shoulder problems among the non-severe impairments he believes the ALJ should have considered.  He cites a single page of the record to support his assertion that he suffered from shoulder problems. Pl. Br. 10, citing R. 293.  On that page, Mr. Mullins' pain specialist mentioned in his recitation of Mr. Mullins' medical history that he had had surgery on his left shoulder for a rotator cuff tear.  There is no indication of the severity or timing of this condition, nor is there any indication that Mr. Mullins suffered any lingering or long-term shoulder impairment.  The court is not obliged to search the record for additional evidence of the condition of Mr. Mullins' shoulders.  A passing mention on one page of the record is insufficient ground on which to find that the ALJ erred on this point.

regarding his knee condition dating from April 2005.  He noted that Mr. Mullins suffered a heart attack in September 2000 but had no noteworthy heart issues again until April 2002, when Mr. Mullins complained of chest pain but left the hospital against medical advice.  As for Mr. Mullins' mental state, the ALJ noted that Mr. Mullins' family physician treated him with anti-depressants from 1995 to 2001, and in 2001 Mr. Mullins described his depression as "mild."  Then, in May 2004, Dr. Smith diagnosed Mr. Mullins with "anxiety disorder."  Overall, as the ALJ noted, there is scant evidence of Mr. Mullins' knee, heart, and mental impairments pertinent to the time period under consideration:  May 20, 2002 to June 30, 2002.  Consistent with the available evidence, the ALJ gave little weight to Mr. Mullins' knee problems, heart condition, and mental condition, and the court does not find that the ALJ's decision in this regard was error.

<em>Conclusion</em>

For the foregoing reasons, the ALJ's decision to deny Mr. Mullins' claim for disability insurance benefits is affirmed.  The court will enter final judgment for defendant.

Date:  February 8, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Heidi Kendall-Sage
ECKERT ALCORN GOERING & SAGE
sage@eaglaw.com,lacy@eaglaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,lin.montigney@usdoj.gov